Ben Crump (pro hac vice)
Nabeha Shaer (pro hac vice)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
Telephone:     (800) 713-1222
court@bencrump.com

Linda D. Friedman (pro hac vice)
Suzanne E. Bish (pro hac vice)
George Robot (pro hac vice)
Mark S. Current (pro hac vice)
STOWELL & FRIEDMAN LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
Telephone:     (312) 431-0888
sbish@sfltd.com

Sam Sani (SBN 2733993)
SANI LAW, APC
15720 Ventura Blvd., Suite 405
Encino, CA 91436
Telephone:     (310) 935-0405
ssani@sanilawfirm.com
*Attorneys for Plaintiffs and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APRIL CURLEY, DESIREE MAYON, RONIKA LEWIS, RAYNA REID, ANIM AWEH, and EBONY THOMAS, individually and behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC,<br><br>Defendant. | CASE NO: 4:22-cv-01735-YGR<br><br>**SECOND AMENDED COMPLAINT**<br><br>Class Action<br><br>Jury Trial Demanded |

**SECOND AMENDED COMPLAINT**

**CLASS ACTION**

469015

Plaintiffs April Curley ("Curley"), Desiree Mayon ("Mayon"), Ronika Lewis ("Lewis"), Rayna Reid ("Reid"), Anim Aweh ("Aweh"), and Ebony Thomas ("Thomas") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, Ben Crump Law, PLLC, Stowell & Friedman, Ltd., and Sani Law, APC, hereby file this Second Amended Complaint against Defendant Google, LLC ("Defendant" or "Google") and in support state as follows:

## NATURE OF THE ACTION

1.      Google famously adopted "don't be evil" as a core value in its early days. Yet it has grown into one of the world's largest corporate behemoths, Google has practiced one of this nation's oldest evils—race discrimination.

2.      Pursuant to its strong, racially biased corporate culture, Google is engaged in a pattern and practice of systemic race discrimination against its African American and Black employees and job applicants. Google's centralized leadership, which is nearly devoid of Black representation, holds biased and stereotypical views about the abilities and potential of Black professionals. As a result, and pursuant to company-wide discriminatory policies and practices, Google refuses to hire extraordinarily qualified Black job applicants, and subjects the few Black employees it does hire to wildly differential treatment. Google assigns Black professionals to lower-level roles, pays them less, unfairly rates their performance, and denies them advancement and leadership roles because of their race. Black professionals at Google face a racially hostile work environment and suffer retaliation if they dare to challenge or oppose the company's discriminatory practices. As a result, Black employees at Google earn and advance less than non-Black employees and suffer higher rates of attrition.

3.      Plaintiffs have been harmed by Google's racially hostile work environment and company-wide discriminatory practices. Due to its abysmal representation of Black professionals since its founding and growing public awareness of its lack of commitment to genuine diversity and inclusion, Google hired Plaintiff Curley in 2014 to expand its outreach to Black college students. Like other Black professionals, including Plaintiffs Mayon, Lewis, and Reid, Google placed Curley in a lower job grade and title than her work and responsibilities warranted and denied her pay and promotion opportunities because of her race. Plaintiffs Curley, Mayon, Lewis, Reid and other Black professionals were often pigeon-holed into dead-end jobs—with less visibility, lower pay, and no advancement opportunities.

4.      As Curley brought talented, qualified Black candidates to Google, she discovered Google did not really care about diversity and equal employment opportunities but sought only to burnish its public image for marketing purposes. Google wanted Curley, as an African American woman, to quietly put on a good face for the company and toe the company line. But Curley was unwilling to be used as a mere marketing ploy. Curley was a champion for Black employees and Black students; she vocally opposed and called for reform of the barriers and double standards Google imposed on Black employees and applicants. In response to her advocacy for herself and other Black employees subjected to Google's discriminatory practices, Google unlawfully marginalized, undermined, and ultimately terminated Curley because of her race and her protected activity.  Consistent with Google's retaliation against Curley for speaking out against the company's discrimination, Google similarly targeted Plaintiffs Mayon, Lewis and Reid for reporting their own discriminatory treatment.

5.      Like many of the talented Black candidates Curley presented to Google, Plaintiffs Aweh and Thomas experienced Google's discriminatory hiring practices first-hand. Despite their outstanding credentials and experience, Google refused them employment because of their race. Indeed, after Plaintiff Thomas successfully completed a rigorous application and interview process, she was rejected as not a "cultural fit" or "Googly" enough, a racial dog whistle that is code for race discrimination. Aweh was similarly denied over 10 jobs for which she was well qualified.

6.      Plaintiffs bring this action on behalf of themselves and a class of current and former Black Google employees and rejected applicants in order to hold Google accountable for its systemic race discrimination, to redress Google's discrimination against Black professionals across the country, and to achieve necessary reforms and injunctive relief to end Google's discriminatory employment practices and provide equal opportunities for all Google employees.

## JURISDICTION AND VENUE

7.      Plaintiffs' claims arise under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts.

8.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Google resides and maintains its principal place of business and headquarters in this District and the practices challenged by this lawsuit were issued in this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## PARTIES

9.      Google, LLC is one of the largest companies in the world. Google develops and sells technology products and services. Google services generated over $257 billion in revenue in 2021.[1] Google was originally incorporated as Google Inc. but in a 2015 corporate restructuring converted to an LLC. Google is now a wholly-owned subsidiary of XXVI Holdings, Inc., which is incorporated in Delaware with a principal place of business in Mountain View, California. Google's publicly traded ultimate parent company, Alphabet Inc., has a market capitalization of over $1.7 trillion as of this filing, placing it third among the most valuable companies in America and fourth globally.

10.      Google maintains its corporate headquarters at 1600 Amphitheatre Parkway, Mountain View, California. Google employs over 21,000 employees at its corporate headquarters, and tens of thousands of employees across the United States.

11.      Plaintiff April Curley is an African American woman and was employed by Google as a University Programs Specialist in New York City, New York from 2014 until she was unlawfully terminated in September 2020. Throughout her employment, Curley worked diligently and performed at a high level for Google. Nonetheless, pursuant to Defendant's nationwide pattern or practice of race discrimination and discriminatory employment practices, Google paid Curley lower wages and denied her advancement opportunities because of her race, and subjected her to a hostile work environment and retaliation.

---

[1] Alphabet Inc., Form 10-K at 32 (Feb. 2, 2022),
https://www.sec.gov/ix?doc=/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm

SECOND AMENDED
COMPLAINT
- 5 -

12. Plaintiff Desiree Mayon is an African American woman and was employed by Google as a Technical Program Manager from August 2019 until she was unlawfully terminated in September 2021. Throughout her employment, Mayon worked diligently and performed at a high level for Google. Nonetheless, pursuant to Defendant's nationwide pattern or practice of race discrimination, Google denied Mayon compensation and advancement opportunities because of her race, and subjected her to a hostile work environment and retaliation, among other things. Google also subjected Mayon to discrimination and retaliation due to her sex and disability.

13. Plaintiff Ronika Lewis is an African American woman who has been employed at Google as a Senior Program Manager in the Mountain View, California headquarters since February 2020. Throughout her employment, Lewis has worked diligently and performed at a high level for Google. Nonetheless, pursuant to Defendant's nationwide pattern or practice of race discrimination, Google has denied Lewis compensation and advancement opportunities because of her race, and subjected her to a hostile work environment and retaliation.

14. Plaintiff Rayna Reid is an African American woman and was employed by Google as a Staffing Channel Specialist in Austin, Texas from October 2018, until she was unlawfully terminated in January 2020. Throughout her employment, Reid worked diligently and performed at a high level for Google. Nonetheless, pursuant to Defendant's nationwide pattern or practice of race discrimination, Google denied Reid compensation and advancement opportunities because of her race, and subjected her to a hostile work environment and retaliation.

15. Plaintiff Anim Aweh is an African American woman who applied for employment at Google in November 2021 and thereafter, but was denied jobs for which she was well qualified because of her race and pursuant to Google's discriminatory hiring practices.

16.     Plaintiff Ebony Thomas is an African American woman who applied for employment at Google in April 2021 and thereafter, but was denied jobs for which she was well qualified because of her race and pursuant to Google's discriminatory hiring practices.

## FACTUAL ALLEGATIONS

**Google Systematically Discriminates Against Black Employees**

17.     Google is engaged in a nationwide pattern or practice of intentional race discrimination and maintains employment policies and practices that have a disparate impact against Black employees and job applicants across the United States.

18.     Google's overwhelmingly non-Black executives hold racially biased, stereotypical, and harmful views of Black employees and employment candidates. Indeed, the California Department of Fair Employment and Housing is currently investigating Google for its treatment of Black female employees.[2]

19.     Google's racially biased corporate culture and discriminatory practices emanate from but extend far beyond its California headquarters. Pursuant to discriminatory company-wide policies and practices, Google favors white men and hires few Black employees and assigns the few Black employees it hires into lower-paying, lower-prestige roles with fewer opportunities for advancement than Google's non-Black employees.

20.     When Google hired Plaintiff Curley in 2014, for instance, only 628 of its over 32,000 employees—1.9%—identified as Black or African American. At that time, Google had only one Black or African American top-level executive out of 25. Over the next two years Google added 5 white top-level executives, but the African American count remained at one. By

---

[2] https://www.nbcnews.com/news/nbcblk/california-investigates-googles-treatment-black-women-workers-rcna9154

2020, despite the heroic and uphill efforts of people like Plaintiff Curley, the overall demographics had scarcely budged. Under intense public scrutiny to address its abysmal underrepresentation of African Americans in the wake of the murder of George Floyd and ensuing national racial reckoning, Google made concerted, public-relations–driven efforts to recruit Black employees. As of 2021, Google's workforce inched up to a dismal 4.4% "Black+."[3] This seeming improvement still pales by comparison to the 2021 U.S. Bureau of Labor Statistics data, which reflects a 9.1% Black or African American representation within Google's industry classification.[4] But Google steers and traps its "Black+" hires into lower-paying and lower-prestige roles. Google's awful underrepresentation is even worse in leadership and prestigious technical roles. For instance, in 2021, Google's leadership ranks were only 3% Black and its prestigious tech workforce was only 2.9% Black.

21.     Google's anemic diversity statistics are the result of its discriminatory hiring and employment policies and practices. Google employs company-wide hiring policies and practices for the recruitment, screening, interviewing, evaluating, and hiring of candidates that discriminate against Black applicants at every step of the hiring process. Google disproportionately screens out and assigns lower scores to Black applicants than similarly qualified and even less qualified non-Black applicants, among other discriminatory practices. Google relies on factors and processes that individually and collectively discriminate against Black applicants and hold Black applicants to differential and higher standards than non-Black applicants. Indeed, even when Black applicants "pass" the initial screens and interviews, Google employs discriminatory "culture-fit"

---

[3] Google's self-reporting category "Black+" includes employees who identify as more than one race, one of which is Black.

[4] https://www.bls.gov/cps/cpsaat18.htm

interviews to assess a candidate's "Googlyness" to deny well reviewed Black applicants opportunities and positions for which they are otherwise well-qualified, and often the best candidate.

22.     The Black employees hired by Google must work in an unflinchingly hostile workplace, in which racial segregation and harassment are commonplace and unabated. Pursuant to its racially biased corporate culture, Google fosters a racially hostile work environment in its workplaces across the country, including its Mountain View headquarters. While non-Black Googlers freely stroll Google's state-of-the-art workplaces, Black Google employees are viewed with suspicion and routinely harassed and subjected to invasive security stops and identification checks. They are treated as unwelcome outsiders or even threats at Google's Mountain View headquarters, reminiscent of the over-policing of Black communities that plagues America. In doing their jobs and pursuing their careers and dreams at Google, Black employees are openly subjected to striking racist and racialized comments and conduct by their peers and managers. There is open and offensive talk at Google of slavery and skin color, and racial caricatures and stereotypes abound. Google personnel falsely assume and openly comment that Black professionals are unqualified, dumb, and do not belong. For example, Black professional "Googlers" are often assumed to be "the help" and directed to help with dishes and told to smile more and ask to be of service to non-Black colleagues and managers. Google's racially hostile workplace is so pervasive and notorious that employees of color created a shared document on the company's intranet to share thousands of examples of acts of harassment and microaggressions they face on a daily basis at Google offices.

23.     In addition to being forced to work in a racially hostile work environment, Black Google employees face company-wide discriminatory pay, level and job assignment, performance assessment, and advancement and promotion policies and practices that systematically underpay, diminish, and delay and deny their advancement in a number of ways.

24.     Google assigns "levels" to all positions across the country. For example, Level 2 is the lowest level Google assigns to permanent, full-time employees, typically reserved for hires straight of out college. Level 3 corresponds to entry-level work, typically for recent college graduates. Google considers all employees at the same level—regardless of location in the United States—to perform substantially equal or substantially similar work. Each level is to correspond to a standardized base salary and compensation range, among other things.

25.     Following its company-wide pattern or practice of discrimination and racially biased culture, Google places Black hires and employees into lower-levels than their experience and responsibilities warrant and than similarly situated non-Black hires. Google pays Black employees less compensation and steers them into roles that lack opportunities for advancement or leadership.

26.     Google's compensation policies and practices result in racial pay disparities based on this levelling. For example, Google's pay practices regarding bonuses and stock options harm Black employees. Among other things, Google awards bonuses and stock options to its employees with progressively increasing bonus targets depending on level. At Level 3, for instance, Google's centralized, nationwide policy establishes a bonus target of 15% of base compensation. At Level 4, the bonus target increases to 20% of the already-higher base compensation. Thus, by steering Black employees into lower levels and paying them less than

non-Black employees within level, Google intentionally uses policies that compound any pay disparity between Black and non-Black employees throughout their careers. These disparities only worsen because Google rarely offers its Black employees opportunities for advancement.

27.     Under Google's compensation policies and practices, Black professionals otherwise are paid lower salaries and bonuses and receive less equity than comparable non-Black employees.

28.     Further, Google maintains company-wide racially discriminatory performance assessment, management, and review policies and practices, which result in Black employees being rated lower than their performance warrants and denied advancement opportunities, compensation, and other benefits. Indeed, Google's own internal studies and reports reflect that it rates Black employees lower than their non-Black colleagues in performance review ratings. Pursuant to Google's discriminatory practices, Black employees are more likely than any other group to receive a job-threatening "Needs Improvement" performance review, which results in substantial earnings losses, is the death-knell for advancement, and often ends their Google careers.

29.     Google also maintains corporate policies and practices that deny Black professionals advancement and promotions, stunting their careers and depressing their earnings.

30.     By assigning Black employees to lower-level positions, compensating them less within levels than similarly situated non-Black employees, unfairly evaluating their performance, and denying Black employees advancement opportunities into higher levels, under Google's centralized, nationwide policies, Black employees are paid substantially less than similarly situated non-Black employees. Moreover, because of the racially discriminatory and hostile

environment at Google, as well as the underpayment and denial of advancement, Black employees suffer above-average attrition rates at Google. In fact, Google's most recent data shows that from 2020 to 2021, a period during which white attrition decreased, the already-high attrition rate for all Black employees increased, with attrition for Black women in particular exceeding firmwide attrition by nearly 50%.[5]

31.     Complicit in Google's pattern or practice of race discrimination and retaliation is its human resources group, which is ineffective at resolving complaints of discrimination, harassment, and retaliation. Black employees recognize the futility of lodging internal complaints. The few brave enough to come forward suffer retaliation. Google's human resources department and legal department defend discriminators, harassers, and retaliators, and do not take adequate steps to prevent Google from retaliating against Black employees who lodge complaints.

32.     Google does not foster an environment where Black employees feel free to complain of discrimination or harassment.  Instead, Black employees often feel intimidated from coming forward and suffer retaliation.

33.     Thus, during Plaintiffs' employment, before and afterwards, Google engaged in a pattern or practice of discriminatory and retaliatory conduct toward its Black employees and applicants throughout the United States including, but not limited to the following practices:

    a.    Google employs discriminatory hiring policies and practices and denies qualified Black applicants employment because of their race;

    b.    Google employs policies and practices that result in occupational segregation by race and racial steering;

---

[5] *2021 Diversity Annual Report* at 13, GOOGLE, https://static.googleusercontent.com/media/diversity.google/en//annual-report/static/pdfs/google_2021_diversity_annual_report.pdf.

c. Google employs discriminatory pay policies and practices, including assigning Black employees to positions at lower "levels" and to lower paying jobs than it assigns non-Black employees;

d. Google employs discriminatory advancement policies and practices, including placing Black employees into positions without advancement opportunities and denying or delaying advancement opportunities to Black employees;

e. Google fails to credit its Black employees for their experience on the same basis as non-Black employees and fails to recognize Black employees for timely promotions, pay adjustments, and title changes on the same basis as non-Black employees;

f. Google maintains discriminatory compensation practices and systematically pays its Black employees lower wages and/or denies them opportunities to increase their earnings;

g. Google employs racially discriminatory performance assessment, management, and review policies and practices, which result in Black employees being rated lower than their performance warrants and results in Black employees being denied advancement opportunities, compensation, and other benefits and in unwarranted performance management and discipline, including termination;

h. Google takes adverse actions against its Black employees, such as unwarranted performance management actions, reduction in job responsibilities, demotions, transfers, constructive discharges, reduction in pay, and discharges on account of their race and/or their rejection of or unwillingness to tolerate a racially discriminatory or hostile work environment;

i. Google relies on race and negative stereotypes about the abilities and potential of Black employees in making employment decisions;

j. Google denies Black employees important resources, grooming, managerial and administrative support, special project work, training, and business opportunities because of race;

k. Google humiliates, intimidates, harasses, and demeans its Black employees and otherwise creates a hostile and offensive work environment;

l. Google takes adverse actions against its Black employees who report, reject, oppose, or are otherwise unwilling to tolerate discrimination or racially hostile work environments;

m. Google refuses to undergo impartial, thorough investigations or take meaningful corrective action against co-workers and managers who engage in racial harassment and racial discrimination.

SECOND AMENDED
COMPLAINT

34.     Google's policies and practices demonstrate that it fundamentally devalues equal employment opportunity. Google, for instance, engages in similar discrimination against other protected classes. A court certified a class of over 10,000 female California Google employees paid less than men because Google "(a) assign[s] women to lower 'Levels' (i.e. salary bands) than it assigns men; (b) assign[s] women to jobs that do not compensate as highly as those populated largely by men; (c) promot[es] women more slowly and at lower rates than it promotes men; and (d) pay[s] women less than it pays men performing similar work." (*Ellis v. Google*, No. CGC-17-561299 (Superior Ct. of S.F. Cnty.), First Amended Complaint, ¶ 3.) One of the class representatives alleges, consistent with Plaintiff's experience, that she was "placed . . . into Level 3, even though she had four years of directly relevant work experience." (*Id.* ¶ 59.) Google recently agreed to settle *Ellis* for $118 million, in addition to certain programmatic relief.

35.     The intentional and disparate impact discrimination described above is ongoing and constitute a continuing violation of the civil rights laws.

36.     The racially discriminatory policies and practices at Google are uniform and national in scope. Class members are relying on Plaintiffs and this lawsuit to protect their rights.

**Plaintiffs Were Subjected to and Harmed by Defendant's Unlawful Conduct**

**April Curley**

37.     April Curley, like other class members, was subjected to a hostile work environment and harmed by Google's racially discriminatory practices throughout her tenure. When she complained, sought to change these practices, and advocated for others, she suffered retaliation.

38.     Curley worked as a People Programs Specialist I, also known as a University Programs Specialist, from 2014 until she was unlawfully terminated in 2020. Curley worked for Google in New York, NY from her hire in 2014 until approximately December 2018, and then transferred to the Washington, D.C. office, where she worked until her termination.

39.     Because of Google's abysmal underrepresentation of Black employees, Google recruited Curley to design and scale a program of outreach to Historically Black Colleges and Universities and to recruit Black students. When Google hired Curley, she had been successfully performing a similar role at Teach for America for three years, and held a Master's degree along with an additional two years of work experience. Yet Google "under-leveled" Curley. At the time Google hired her, her Master's degree and five years of professional experience should have corresponded to Level 5, yet Google assigned her to only Level 3—entry level post-bachelor's degree—and never promoted her or gave her merit pay increases. Indeed, Google never assigned Curley to the higher level she deserved despite her stellar qualifications and performance.

40.     Curley's talent, hard work, and experience paid off—she established a strong pipeline of talented Black engineering candidates, providing Google access to a wealth of previously untapped technical expertise and leadership potential. Thanks to Curley's efforts, Google started to see an increase in its Black technical hiring. Curley enjoyed the recognition of her peers and the acclaim of the participants in the campus experiences she created.

41.     In her role, Curley discovered that Google was biased against and reluctant to hire Black talent, subjecting Black students to more stringent hiring practices than non-Black candidates. Plaintiff vocally opposed Google's systemic discrimination, including the following discriminatory employment practices, among others:

- Google viewed Black candidates through harmful racial stereotypes and hiring managers deemed Black candidates not "Googly" enough, a plain dog whistle for race discrimination;

- Google interviewers "hazed" and undermined Black candidates, regularly asking level-inappropriate questions of Black candidates to intentionally tank their interview scores.

- Google hired Black candidates into lower-paying and lower-leveled roles, with less advancement potential, based on their race and racial stereotypes.

42.     Curley and her Black female colleagues advocated to break down these barriers. Google was openly hostile to this advocacy for equal employment opportunities, and made clear to Curley that she was supposed to be only window dressing. Google expected Curley and her Black colleagues to execute the majority-white management's marketing-focused Black recruitment strategies and never raise any concerns while doing so. Curley and her teammates' advocacy quickly earned them a reputation within Google's discriminatory management culture as "difficult," "negative," and "hard to work with."

43.     Because Google intended Curley to be a marketing ploy rather than a real champion for Black opportunity and change, Google sought at every turn to marginalize her and prevent her from advocating for herself and other Black Google employees and applicants. Google hired a revolving door of managers to supervise Curley, many of whom harbored animus toward Black employees and especially Black women. Google selected managers who, among other things:

- Frequently mistook Curley and her two Black female colleagues for each other and called them by each other's names;

- Called Curley and her Black female colleagues "the girls" or demeaning labels other than their names;

- Refused to acknowledge or let Curley and her Black female colleagues speak in or present during important meetings;

- Described Curley and her Black female peers' work as "low-level";

- Created work environments so hostile that Curley's female peers were forced to leave the company, or suffered emotional distress;

- Ignored and devalued Curley and her Black female peers' expertise at their jobs and with Black students, even though the managers lacked the same level of success.

- Refused to support or nominate Curley or her Black female colleagues for pay and advancement opportunities;

- Discouraged Curley and her Black female peers from challenging Google's racially discriminatory practices against Black students;

- Demeaned and sexualized Curley as a Black woman, including by asking her which colleagues she wanted to sleep with.

44.     Curley sought help and reform and reported this conduct and several managers to Google's HR department and upper management. These complaints were ignored, and worse, resulted in increased discrimination and harassment. Google conducted no meaningful investigations and took no corrective actions. To the contrary, Google repeatedly promoted managers who discriminated, retaliated, and created a hostile work environment.

45.     Among Curley's nine supervisors, only one was a Black woman. This manager was also the only one to put Curley up for a level increase, which would have adjusted Curley's pay and job level to account for the higher-level work she was already performing. Curley's pay adjustment was approved, yet when the time came for her level increase to be announced, Google falsely claimed it lacked the budget to adjust her pay. Curley was never considered for advancement opportunities again. Her sole African American female manager lasted less than two years in the role.

46.     Curley later learned that a high-level white manager had blocked her pay and level increase. Although that manager worked on the same floor as Curley and the two enjoyed a cordial relationship, she admitted to Curley that she considered her "intimidating," "unwelcoming," and—a stereotype Black women in America are all too familiar with—"angry." She refused to consider Curley for any advancement opportunities because of her race and reports of discrimination at Google.

47.     Throughout late 2019, Google repeatedly reprimanded Curley and cut her annual compensation for speaking up in team meetings and challenging internal practices.

48.     Curley again sought help and filed an HR complaint in January 2020. Google conducted no investigation and instead the complaint doomed Curley's career at Google.

49.     In spring of 2020, a group of the dozen or so Black and Latinx employees within University Programs, including Curley, assembled to address the many issues facing people of color at Google, including but not limited to lack of advancement opportunities, exclusion from leadership, underpayment, underleveling, and high attrition. The group met several times and developed a list of desired reforms.

50.     In plain retaliation for Curley's leadership role in this advocacy group, in June 2020, Google placed her on an informal performance improvement plan ("PIP"). Despite Curley's strong performance during the informal PIP, in early August 2020, Google intensified its retaliation, warning Curley to either accept severance immediately or be placed on a formal performance improvement plan, where it was clear that Google would terminate her employment at the end of the plan. Curley chose to fight for her job and began a formal 30-day performance improvement plan that was slated to end on September 17, 2020.

51.     While on the PIP, Curley advised Google she was preparing a detailed report about its racial bias in hiring practices. In response, Google ended Curley's PIP early and unlawfully terminated her employment on September 11, 2020, freezing out her access to the document and her ability to complete and submit her report documenting the discriminatory practices.

52.     As a result of Google's unlawful conduct, Curley, like other class members, has lost wages, promotional opportunities, and other benefits, and suffered irreparable harm to her career, emotional distress, and other nonpecuniary losses. Google's actions have caused and continue to cause Plaintiff substantial losses in earnings and other employment benefits, in an amount to be determined by a jury.

**Desiree Mayon**

53.     Desiree Mayon worked as a Technical Program Manager at Google from August 2019, until she was unlawfully terminated in September 2021. Like other Black Google employees, Mayon was subjected to a racially hostile work environment and harmed by Google's racially discriminatory employment practices throughout her tenure. When she complained, sought to change these practices, and advocated for herself and others, she suffered retaliation.

54.     When Google recruited Mayon, she was well qualified to excel: she was a successful senior technical program manager for a global online e-commerce company, held two bachelor's degrees, and had over 18 years of professional work experience managing technical software projects. Mayon speaks Vietnamese, Mandarin, Spanish, and American Sign Language and is able to code using 7 different languages. Despite her considerable experience and outstanding credentials, and consistent with its company-wide discriminatory practices, Google

"under-leveled" Mayon, placing her in Level 4 and refusing to place her in a higher level and otherwise denying her advancement opportunities during her tenure.

55.     Throughout her employment, Google marginalized and undermined Mayon, refusing to credit her outstanding work or provide her with support, resources and opportunities because of her race. Consistent with its systemic race discrimination, Google denied Mayon merit pay increases and other compensation. Google subjected Mayon to race and sex discrimination and an unflinchingly hostile work environment. Google's supervisors and employees knew, participated, and encouraged the discrimination and hostile work environment.

56.     Google's racially hostile work environment is severe, pervasive, and continued throughout Mayon's employment. Examples of the racial hostility to which Google subjected Mayon, includes but is not limited to the following:

- Google employees made racist references about Mayon's skin color; one colleague said "I thought black people didn't get sunburns" as it was "historically impossible" due to slaves working outside all day at plantations.

- Mayon was subjected to racist comments, such as "well, you don't really look that black," implying that being a Black person or having darker skin color is a problem.

- Mayon's colleague ordered her to ask, "how can I serve you?" before addressing him.

- Mayon was "badge checked" by a Google employee and told she could not use the only woman's restroom in the building. The Googler then chased Mayon around the bathroom while proclaiming, "your people are not welcome here," referring to African Americans.

- Google employees regularly "badge checked" Mayon (and other Black employees) despite her visibly wearing her badge, but did not "badge check" her non-Black visiting friend.

- Mayon was the subject of racial slurs and racialized and racially stereotypical comments, including being called a "bitch" and aggressive, and being told "she

was not smart enough to be technical." Mayon was told she is "loud and every stereotype of a black woman."

- Mayon's colleague told Mayon that she "doesn't have to speak to people like you," meaning Black people.

- Mayon was subjected to racist and offensive comments by her team's lead, including being told she was "incompetent," "needs to go back to grammar school," and needs to "learn how to speak proper English."

- Consistent with stereotypes about Black women, Mayon was labelled as "aggressive" by HR, and told by management to her "womanly ways," and "dumb herself down."

- Google's Chief of Staff dismissed Mayon's concerns regarding racial discrimination and ordered her not to "bring her Blackness to work," or words to that effect.

- Mayon's concerns regarding racial discrimination were minimized when a colleague asked, "why do all Black people feel attacked?"

- After an intense meeting, Mayon's manager used his body to push Mayon back down into her chair.

57.    Mayon sought help and reported the scope and severity of the discrimination and harassment to numerous supervisors, Human Resources, and even to Google executive-level employees, to no avail. To the contrary, the discrimination escalated, and Mayon suffered severe retaliation.

58.    On June 8, 2020, a senior level executive at Google sent a companywide email addressing the killings of four Black Americans—Ahmaud Arbery, Dreasjon Reed, Breonna Taylor, and George Floyd. The email encouraged Google employees to "stand together against injustices," and to use at least 30 minutes of the next day to "educate yourself" about racial injustice. The senior-level executive went on to proclaim, "I've been spending some time reflecting on the recent headlines and what I can do better as an ally. I welcome any feedback . . . I stand in solidarity with the Black community."

59.     Hopeful and following the executive's directive to respond, Mayon replied to the executive's email and provided an account of some of the racial discrimination she experienced as a Black woman at Google. After replying to the email, Mayon's concerns were not addressed and Mayon continued to suffer discriminatory treatment. Google's messaging was plainly insincere lip service.

60.     Indeed, after Mayon again raised the issue of race discrimination, her manager screamed at her and slammed his door, hitting Mayon in the face. After realizing Mayon was injured, rather than apologizing, Mayon's manager jerked open the door and said, "It is always something with you," or words to that effect, and stormed off.

61.     Human Resources refused to conduct a full and fair investigation or take meaningful corrective action to halt the discrimination in response to any of her complaints. Instead, HR chastised Mayon and demanded that she just "assume the best intent" of her colleagues and managers.

62.     In further acts of discrimination and retaliation, HR allowed the same manager that hit Mayon with the door to give her an inaccurate and unwarranted "Needs Improvement" performance review. This was plainly retaliatory and consistent with Google's racially discriminatory performance management and review practices.

63.     As a result of Google's severe and escalating discrimination and retaliation, Mayon's health deteriorated, requiring her to take medical leaves. After returning from her second medical leave, Mayon was assigned to a new manager, who continued to escalate Google's campaign of discrimination and retaliation. During a heated meeting in which Mayon's

discriminatory treatment was discussed, her manager was accusatory and demanded Mayon learn her place and how to just keep her head down and do her job.

64.     Consistent with Google's discriminatory performance and disciplinary practices, it continued its punitive witch hunt against Mayon. Google issued her false and unfair "write-ups" for attendance while she was on approved medical leave. Worse, Google placed Mayon on an unwarranted PIP for not being "Googly" enough and because she "pissed off [a level 7 manager]." Mayon and other Black employees clearly understand the term "Googly" to be a dog whistle for race discrimination. Google's racial hostility and retaliation against Mayon continued. During her PIP evaluations, Mayon's manager regularly screamed at and berated her, but the HR representative who attended these meetings failed to interject or halt the abuse, despite Mayon's objections.

65.     Google's discrimination, racial harassment and retaliation continued to cause Mayon's health to deteriorate, forcing Mayon to take another protected medical leave. While on medical leave, in plain retaliation for her protected activity reporting racial discrimination an for taking protected medical leave, Google falsely accused Mayon of misconduct and then terminated her employment.

66.     Google sought to punish Mayon further after it fired her. Google contacted Mayon's prospective new employer and falsely claimed that Mayon stole property from Google. As a result of Google's retaliation, Mayon's prospective employer rescinded its job offer.

67.     As a result of Google's unlawful conduct, Mayon, like other class members, has suffered considerable harm and damages. She has lost wages, promotional opportunities, and

other benefits, and suffered irreparable harm to her career, emotional distress, and other nonpecuniary losses. These damages and losses are ongoing.

**Ronika Lewis**

68.     Ronika Lewis has worked for Google since February 2020. Despite her considerable experience and outstanding credentials and performance, Lewis has been subjected to and harmed by Google's discriminatory employment practices and racially hostile work environment. Among other things, Google has denied Lewis advancement opportunities and compensation. When Lewis sought help and reported her unlawful treatment to Google, she suffered retaliation.

69.     In 2019, Google began to recruit Lewis to become the Head of Logistics Strategy Operations and Analytics, for good reason. Lewis had over 20 years of experience as an engineering and technology management professional and was well qualified to excel at Google. She served in a senior capacity at multiple tech startups and Fortune 500 companies and as a technology advisor for public and private universities. Lewis had an excellent industry reputation and was and is often asked to serve as a board advisor, speaker, and technology instructor.

70.     Excited for the career opportunities promised by Google, Lewis left her job and relocated from Boston to California to accept the role as Google's Head of Logistics Operations Strategy and Analytics, a Level 7 position. Unfortunately, after Lewis started at Google, it eliminated the position of Head of Logistics Operations Strategy and Analytics. Consistent with its discriminatory, company-wide job and level assignment practices, Google "down-leveled" Lewis to a Level 6 and lowered her title to Senior Program Manager. Throughout her tenure,

Google refused to place Lewis at the higher level warranted by her experience and performance and denied her compensation and advancement opportunities.

71.     From the moment she started working for Google, Lewis' performance has been outstanding. During the early days of the coronavirus pandemic in March 2020, Google partnered with the White House Coronavirus Response Task Force to assist with providing services for mass testing sites, public registration, and coronavirus tracking. Lewis volunteered in response to a company-wide email from Google's Chief Executive Officer and was selected to be the lead site program manager, where she designed, led, and scaled coronavirus testing sites. Lewis excelled in the crisis and earned multiple awards for her performance, including a Google Citizenship Award, an award rarely, if ever, given to new hires at Google.

72.     Despite her extraordinary leadership, service, and performance, Google denied Lewis pay, recognition, and advancement opportunities pursuant to its discriminatory employment practices. Google also refused to increase Lewis' job level or compensation. Lewis asked Google to be promoted multiple times, but she was denied. After receiving an exceeds expectations rating on her performance review, Lewis again requested a promotion. During a meeting thereafter, Lewis' manager stood up and slammed his fist down on the desk and demanded, yelling, that she "take that promotion request down," or words to that effect.

73.     After being denied the opportunity to advance and be promoted, Lewis transferred to a different role, where her new manager promised to correct her level and increase her pay after the transfer. However, in order to transfer, Lewis was again required to be "down-leveled." Lewis transferred roles and was demoted and down-leveled to a Level 5 employee.

74.     In her new role, Lewis consistently and successfully performed work above Level 5 without pay adjustments or advancement. Senior-level executives assured Lewis she was "doing great work" and that her performance "set the standard."  Nevertheless, pursuant to Google's racially discriminatory performance assessment and review practices, Lewis' stellar performance was not recognized in her performance review. She again was denied the promised level correction and pay increase.

75.     Hoping to escape her discriminatory environment and advance her career, Lewis accepted a new regulatory compliance role with a different manager. Lewis' new manager agreed to raise Lewis' level and pay, but again, after her transfer, Google reneged on its promises and neither Lewis' level nor compensation changed. Despite her outstanding performance, Google told Lewis she would have to wait at least 2 or 3 years for a promotion. This is contrary to how Google treats non-Black employees, including those with lesser performance, who are regularly promoted with less than one year of tenure. Indeed, in her current role, Lewis has observed multiple new hires with equal or less experience, all offered higher compensation packages than Lewis.

76.     Throughout her employment, Lewis has been subjected to severe and pervasive racial harassment and Google's racially hostile work environment. For example, a racially hostile colleague, to slow Lewis' progress and hamper her performance, stole Lewis' work-issued cell phone and lied about it for days until finally admitting, without repercussion, that he "had it the whole time." After witnessing the incident, another Google employee told Lewis to ignore it because "every third person here is like him," meaning racially biased. During her tenure, Lewis had to endure a barrage of additional racist comments and treatment, such as being told:

- "You're not smart enough to work at Google"

- "You should be a Doordash driver instead of working at Google"

- "You are a liar and people like you are liars," referring to Black people

- "I want to see you take a bone off someone's plate and bite into it" at a Google sponsored country club event

77.     Rather than receiving the grooming and support that her white colleagues enjoyed, Google undermined and devalued Lewis at every turn. Lewis was marginalized and excluded by superiors and peers; she was placed on teams that were understaffed, had work assignments constantly changing, and was pulled into unscheduled meetings to present to Google Executives with no advance warning, when other colleagues worked collaboratively in secret preparing for these meetings.

78.     Throughout her employment, Lewis repeatedly complained and reported to numerous supervisors of Google's discriminatory pay, treatment, and hostile work environment. In an attempt to seek help, Lewis also made complaints to Google's HR department, to no avail. To the contrary, the discrimination escalated and Lewis suffered severe retaliation.

79.     Google's worsening working environment and targeting led Lewis to have significant health issues which continued to worsen. Because of Google's treatment, Lewis even passed out at work. Google was unsympathetic; when she notified Google she required surgery, Google forced Lewis to postpone the surgery multiple times causing her further harm.

80.     As a result of Google's discrimination and retaliation, Lewis has been considerably harmed. She has lost compensation and jobs, suffered extreme emotional distress, and her career and reputation have been irreparably harmed.

1  **Rayna Reid**

2      81.     Rayna Reid worked for Google as a Staffing Channels Specialist, from October

3  2018, until she was constructively discharged in January 2020. When Google recruited Reid, she

4  was well qualified to excel: she was a successful Managing Director for a national firm, held a

5  Master's Degree in education, a Juris Doctorate, a New York license to practice law, and had over

6  7 years of experience, including serving as Counsel for the Committee on Education and the

7  Workforce at the United States House of Representatives. Despite her considerable experience

8  and outstanding credentials, and consistent with Google's firm-wide discriminatory practices,

9  Reid, like other class members, was subjected to and harmed by Google's discriminatory

10  employment practices and racially hostile work environment throughout her tenure. When she

11  complained to Google on multiple occasions and sought to change these practices, she suffered

12  retaliation.

13      82.     Reid originally applied to work at Google's New York campus. After multiple

14  rounds of interviews, Google denied Reid a job in New York but offered her a position at

15  Google's Austin, Texas or Mountain View campuses. Excited for the career opportunities

16  promised by Google, Reid left her existing job and moved to Austin to work for Google.

17      83.     Consistent with Google's discriminatory job placement and levelling practices,

18  Google "under-leveled" Reid, placing her at Level 3 because of her race. Indeed, Google gave a

19  white male hired after Reid a Level 4 position even though he had considerably less experience

20  than Reid. Throughout her tenure, Google refused to place Reid at the higher level she deserved

21  and denied her compensation and advancement opportunities.

84.     Google also subjected Reid to racial harassment and a racially hostile work environment, including being subjected to racial stereotypes as a Black woman. During her first month at Google, Reid's managers called her into a room to discuss what they described as "the elephant in the room," and accused her of not liking working in Austin. Having only worked at Google for a couple of weeks, Reid was shocked as she had never expressed that she did not like Austin.

85.     A few months later, Google demanded Reid meet for an early mid-year performance review with her manager. During the meeting, Reid's manager's sole critique was that Reid was not being "Googly" enough and "not smiling enough." Once again, Reid was dumbfounded. After the meeting, in an attempt to understand being "Googly," Reid scrolled through her manager's public social media posts. She discovered in her manager's social media racist anti-Black imagery of a cartoon "Mammy" caricature of an African American woman, smiling while holding a child. In the post, Reid's manager replaced the child's face with his own. Appalled, Reid alerted Human Resources for help and to report the discrimination, to no avail.

86.     Consistent with Google culture and company-wide practices, Reid was subjected to severe and pervasive harassment and a racially hostile work environment that throughout her employment, including not limited to, the following conduct:

- Colleagues openly made racist comments about her hair and announced racist sentiments regarding African Americans such as, "Black men are disgusting."

- Being tokenized and talked to based on racial stereotypes that she did not belong and "should be happy" to be at Google and was not "acting grateful enough" to be at Google.

- During a meeting, a manager used a Black woman gesture trope and started snapping her fingers around in the air. Reid alerted Human Resources, but its response was only that managers "will make assumptions about you."

- Reid was regularly mistaken for a cafeteria worker, even being asked to restock out-of-stock food.

- Reid was denied time to grieve the loss of her uncle and was instructed that it would look bad if she took time off, causing her to fly to and from her uncle's funeral on the same day.

- Accused of being unable to communicate "beyond one word."

87.     Reid reported to HR Google's discriminatory pay, treatment, and hostile work environment on a number of occasions without remedy. To the contrary, the discrimination escalated and Reid suffered serve retaliation. After complaining multiple times, Reid was placed on a PIP in a plain act of further discrimination and retaliation. Reid was outperforming her non-Black peers at the time. She was "over exceeding" her hiring number goal, which Google deemed "mission-critical." Rather than focus on her objectively excellent performance, Google criticized her communication skills and suggested she have "coffee chats" with other team members. Around the same time that Reid was placed on the PIP, Reid won the Google Inclusivity Award, an act which plainly contradicted the false allegations in her PIP.

88.     Google made it clear it was targeting Reid for termination. After placing Reid on the unjustified PIP, Google hired a less educated white male with little to no experience, as a Level 4 recruiter.

89.     Google's escalating discrimination, racial harassment, and retaliation caused Reid's health to deteriorate and forced her to take protected medical leave. In January 2020, after returning from leave, Google continued to target and discriminate and retaliate against Reid, leaving her no choice but to leave Google on Martin Luther King Jr.'s birthday.

90.     As a result of Google's unlawful conduct, Reid, like other class members, has suffered considerable harm and damages. She has lost wages, promotional opportunities, and

1  other benefits, and suffered irreparable harm to her career, emotional distress, and other

2  nonpecuniary losses. These damages and losses are ongoing.

**Anim Aweh**

3

4      91.     Anim Aweh, like other Black and African American candidates, was subjected to

5

6  and harmed by Google's racially discriminatory hiring practices. Pursuant to these discriminatory

7  practices, Google has denied Aweh over ten positions for which she was well qualified because of

8  her race.

9      92.     In November 2021, Google recruited Aweh for an open position at its Mental

10  Health Initiative in Atlanta, Georgia. Aweh was well qualified to work for Google, and to excel,

11  in this role. Aweh is Associate Director of a healthcare facility and a board-certified therapist who

12  earned a master's degree in social work and has over a decade of experience as a licensed clinical

13

14  social worker.

15      93.     Aweh interviewed with the head of Google's Mental Health Initiative and had

16  three more interviews. On February 14, 2022, Google rejected Aweh's application for

17  employment on the basis of her race. Google claimed that Aweh "did not have enough

18  experience," a statement that was plainly false and a pretext for discrimination given her

19
   substantial mental health experience.
20

21      94.     Since then, Aweh has applied to but has not been hired, or even extended an

22  interview, for approximately ten other positions at Google relating to mental health and

23  wellbeing, including jobs in or based out of California and New York. These rejections are not

24  based on her qualifications but on her race.

25

26

95.     As a result of Google's discrimination, Aweh has suffered considerable harm. Among other things, she has lost jobs and compensation, suffered emotional distress, and her career and reputation have been irreparably harmed.

**Ebony Thomas**

96.     Ebony Thomas, like other Black and African American candidates, was subjected to and harmed by Google's racially discriminatory hiring practices.

97.     In April 2021, Google recruited Thomas as a recruiter to focus on providing Google with qualified Black job applicants. Google desperately needed to address its abysmal underrepresentation of Black professionals.

98.     Thomas was well qualified to work for Google, and to excel, in this role. She was a certified diversity recruiter and career coach, with over 20 years of professional work experience, including 10 years as a recruiter and in the information technology industry. Thomas successfully made it through multiple interviews, receiving positive feedback, until Google required her to complete a "cultural fit" interview to assess her "Googlyness."

99.     After Thomas' cultural fit interview, Google informed Thomas that her application could not move forward. When Thomas asked for feedback about why she was not selected, the Google recruiter responded: "I thought you were a perfect candidate. I don't know what happened."

100.    Thomas later learned that though she had received high marks during most of her interviews about her knowledge and experience, she had been flagged for an additional "cultural fit" interview for "Googlyness." Consistent with Google's racially biased corporate culture and discriminatory hiring practices, Google deemed that Thomas was not "Googly" enough.

Googlyness is a racial dog whistle laden with racial bias and stereotypes and is essentially code for racial discrimination.

101.    On May 17, 2021, Google rejected and refused to hire Thomas because of her race.

102.    After being rejected by Google, Thomas was employed as a diversity recruiter at a professional search firm. In this role, Thomas observed Google's discriminatory hiring practices in operation. Thomas presented numerous qualified Black candidates to Google, but Google hired none of them. The few Black candidates to even receive an interview with Google were recommended to be "down leveled" and then rejected. Many of these Black candidates were also subjected to "cultural fit" interviews based on "lingering questions" about their candidacy due to their race.

103.    As a result of Google's discrimination, Thomas has suffered considerable harm. Among other things, she has lost jobs and compensation, suffered emotional distress, and her career and reputation have been irreparably harmed.

## CLASS ALLEGATIONS

104.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs Curley, Mayon, Lewis, and Reid, seek to represent an employee class of:

> All Black and/or African American United States Google employees who
> work or worked for Defendant as a Level 2 through Level 8 employee from
> March 18, 2018 through the present.

105.    Plaintiffs Aweh and Thomas seek to represent a hiring class of:

All Black and/or African Americans who applied to and were denied full-time employment with Google in the United States.

106.    Plaintiff Curley seeks to represent an employee class of:

All Black and/or African American Google employees in or based out of New York who work or worked for Defendant as a Level 2 through Level 8 employee.

107.    Plaintiff Aweh seek to represent a hiring class of:

All Black and/or African Americans who applied to a full-time job at Google in or based out of New York or California and were denied employment.

108.    Plaintiff Lewis seeks to represent an employee class of:

All Black and/or African American Google employees who work or worked for Defendant in or based out of California as a Level 2 through Level 8 employee.

109.    The classes of Black current and former employees and applicants are so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

110.    There are questions of law and fact common to the classes, and those questions can and should be resolved in a single proceeding that furthers this litigation.  Fed. R. Civ. P. 23(a)(2).

111.    The claims alleged by Plaintiffs are typical of the claims of the classes.  Fed. R. Civ. P. 23(a)(3).

112.    Plaintiffs will fairly and adequately represent and protect the interests of the classes.  Fed. R. Civ. P. 23(a)(4).

113.    The proposed classes meet the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3).  The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

114.    Alternatively, the issues of determining liability and equitable relief are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981
(Nationwide Class and Plaintiffs)

115.    Plaintiffs, individually and on behalf of all others similarly situated, reallege the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

116.    Under 42 U.S.C. § 1981, as amended, people of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

117.    Defendant maintained a nationwide set of uniform, intentionally discriminatory employment practices, engaged in a pattern or practice of systemic race discrimination against Black employees and applicants, and created a racially hostile work environment, which constitute illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

118.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

## COUNT II

**RETALIATION IN VIOLATION OF
42 U.S.C. § 1981
(Plaintiffs Curley, Mayon, Lewis, and Reid)**

119.     Plaintiffs realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

120.     Plaintiffs engaged in protected activity and suffered retaliation by Defendant in violation of 42 U.S.C. § 1981.

121.     Plaintiffs suffered harm as a result of Defendant's unlawful retaliation.

## COUNT III

**RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*
(Nationwide Class and Plaintiffs Mayon, Lewis and Aweh)**

122.     Plaintiffs Mayon, Lewis and Aweh, on behalf of themselves and all others similarly situated, reallege the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

123.     Plaintiff Mayon, Lewis, and Aweh filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), which placed Defendant on notice of the representative allegations contained in this Complaint.  Plaintiffs Mayon, Lewis, and Aweh have exhausted their administrative remedies and received their Notices of Right to Sue from the EEOC and filed their individual and class Title VII claims within 90 days of receipt of such notices.

124.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

125.     By its conduct as alleged herein, Defendant unlawfully discriminated against Mayon, Lewis, and Aweh and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

126.     Plaintiffs and other African Americans who work or worked for Google, or were denied employment with Google, were harmed by Defendant's conduct.

<u>**COUNT IV**</u>

**SEX DISCRIMINATION IN VIOLATION OF**
**TITLE VII, 42 U.S.C. § 2000e, *et seq*.**
**(Plaintiff Mayon and Lewis)**

127.     Plaintiffs Mayon and Lewis reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

128.     Mayon and Lewis filed charges of sex discrimination with the EEOC, which placed Defendant on notice of the allegations contained in this Complaint.  Plaintiffs Mayon and Lewis have exhausted their administrative remedies and received Notices of Right to Sue from the EEOC and filed their individual Title VII claims within 90 days of receipt of such notice.

129.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex, or to limit, segregate, or classify its employees or applicants for

employment in any way which deprives or tends to deprive any individual of employment

opportunities or otherwise adversely affect his or her status as an employee on the basis of sex.

130.    By its conduct as alleged herein, Defendant unlawfully discriminated against

Mayon and Lewis in violation of Title VII.

131.    Plaintiffs Mayon and Lewis were harmed by Defendant's conduct.

## COUNT V

### RETALIATION IN VIOLATION OF
### TITLE VII, 42 U.S.C. § 2000e, *et seq.*
### (Plaintiff Mayon and Lewis)

132.    Plaintiffs Mayon and Lewis reallege each and every paragraph above and

incorporate them by reference as though fully stated herein.

133.    Plaintiffs Mayon and Lewis engaged in protected activity by complaining to

management of their unlawful treatment.

134.    Plaintiffs Mayon and Lewis suffered retaliation and materially adverse action

because of their protected activity, in violation of 42 U.S.C. § 2000e-3(a), and were harmed as a

result.

## COUNT VI

### RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF FEHA, Cal. Gov. Code §12940, *et seq.*
### (California Class and Plaintiffs Mayon, Lewis & Aweh)

135.    Plaintiffs Mayon, Lewis, and Aweh, on behalf of themselves and all others

similarly situated, reallege each and every paragraph above and incorporate them by reference as

though fully stated herein.

136.    California Government Code Section 12940(a) makes it an unlawful employment practice for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" on the basis of race.

137.    As set forth above, Google discriminated against Plaintiffs Mayon, Lewis and Aweh and all those similarly situated in the terms and conditions of their employment due to their race under both disparate treatment and disparate impact theories of liability. In doing so, Google engaged in unlawful discrimination in violation of Government Code Section 12940(a).

138.    As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiffs Mayon, Lewis and Aweh and all those similarly situated have incurred and will continue to incur damages in an amount to be proven at trial.

139.    The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiffs', and all those similarly situated, rights, and are thus entitled to recover punitive damages from Defendant.

## COUNT VII

### SEX & DISABILITY DISCRIMINATION AND RETALIATION
### IN VIOLATION OF FEHA, Cal. Gov. Code §12940, et seq.
### (Plaintiffs Mayon & Lewis)

140.    Plaintiffs Mayon and Lewis reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

141.    California Government Code Section 12940(a) makes it an unlawful employment practice for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" on the basis of sex and disability.

142.    As set forth above, Google discriminated against Plaintiffs Mayon and Lewis in the terms and conditions of their employment due to their sex and disability. In doing so, Google engaged in unlawful discrimination in violation of Government Code Section 12940(a).

143.    As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiffs Mayon and Lewis have incurred and will continue to incur damages in an amount to be proven at trial.

144.    The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiffs' rights, and are thus entitled to recover punitive damages from Defendant.

**COUNT VIII**

**DISCRIMINATION AND RETALIATION IN VIOLATION OF
ADA, 42 U.S.C. § 12112, *et seq.*
(Plaintiffs Mayon & Lewis)**

145.    Plaintiffs Mayon and Lewis reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

146.    Plaintiffs bring this Count under the Americans with Disabilities Act 42 U.S.C. § 12112, *et seq.*

147.    Plaintiffs filed a Charges of Discrimination with the EEOC and have exhausted their administrative remedies.

148.    Plaintiffs Mayon and Lewis were qualified individuals with a disability under the ADA because they had been diagnosed with a qualified disability, which impacted one or more of their major life functions such as work, and Defendant regarded them or perceived them as having such impairment. 29 C.F.R. § 1630.2(1).

149.    Plaintiffs Mayon and Lewis informed Google about their disabilities and requested a reasonable accommodation, but Google refused to accommodate them.

150.    Google discriminated and retaliated against Plaintiffs Mayon and Lewis by ignoring their doctors' orders, denying them an accommodation, subjecting them to increased scrutiny, unwarranted performance discipline, denied them compensation and advancement opportunities, and ultimately terminated Plaintiff Mayon's employment.

151.    As a direct and proximate result of Defendant's conduct, Plaintiffs Mayon and Lewis have suffered damages.

## COUNT IX

### INTERFERENCE AND RETALIATION IN VIOLATION OF FMLA, 29 U.S.C. § 2615, et seq.
### (Plaintiff Mayon)

152.    Plaintiff Mayon realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

153.    The Family and Medical Leave Act of 1993 allows all eligible employees of employers with 50 or more employees to take up to 12 workweeks of unpaid, job-protected leave each year.  29 U.S.C. § 2612(a)(1)(A).  Employers may not interfere with FMLA rights.  29 U.S.C. § 2615(a). Pursuant to 29 U.S.C. § 2615(a)(2), it is unlawful for an employer to discriminate or retaliate against an employee who has taken FMLA leave.

154.    Plaintiff was eligible for FMLA protections and Defendant was a qualified employer for purposes of the FMLA.

155.    As alleged above, Defendants interfered with Mayon's protected medical leave and retaliated against her for taking protected medical leave.

156.    As a direct and proximate result of Defendant's conduct, Mayon has suffered damages.

## COUNT X

**RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
(New York Class and Plaintiff Curley & Aweh)**

157.    Plaintiffs Curley and Aweh, individually and on behalf of all others similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

158.    Google maintains a substantial corporate presence in New York. Google employs approximately 12,000 people, including Plaintiff Curley.

159.    The New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290, *et seq*., establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

160.    As part of the recent class action lawsuit in New York state court, *Haggan v. Google*, No 518739/2022 (Sup. Ct. N.Y., Kings County) Google entered into a class-wide tolling agreement, effective from October 15, 2020, that tolled the NYSHRL and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL") claims, among others, of all Black/African American Google employees in New York.[6] Plaintiff Curley relies on this tolling agreement in this action.

---

[6] *See Haggan v. Google LLC*, No. 518739/2022 (Sup. Ct. N.Y., Kings County, June 30, 2022), Dkt. 3 at 3.

161.    By its conduct as alleged herein, Defendant unlawfully discriminated against Curley and Aweh and those similarly situated in violation of NYSHRL, under both disparate treatment and disparate impact theories of liability.

162.    Google maintained racially discriminatory employment practices and policies, including but not limited to hiring, pay, job assignment, promotion, and other practices that had a disparate impact on Black employees who worked for Google in New York.

163.    Plaintiffs and all others similarly situated have suffered damages as a result of Google's violation of the NYSHRL.

<u>**COUNT XI**</u>

**SEX AND SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF
NEW YORK STATE HUMAN RIGHTS LAW
(Plaintiff Curley)**

164.    Plaintiff Curley realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

165.    Google maintains a substantial corporate presence in New York. Google employs approximately 12,000 people, including Plaintiff Curley.

166.    The NYSHRL establishes that it is unlawful, because of an individual's sex or sexual orientation, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

167.    Google violated the NYSHRL by discharging Plaintiff, discriminating against her in compensation and in terms, conditions, or privileges of employment, including by subjecting her to a hostile work environment, because of her sex.

168.     Google maintained discriminatory employment practices and policies, including but not limited to pay, job assignment, promotion, and other practices that had a disparate impact on female and queer employees who worked for Google in New York.

169.     Plaintiff has suffered damages as a result of Google's violation of the NYSHRL.

## COUNT XII

### RETALIATION IN VIOLATION OF
### NEW YORK STATE HUMAN RIGHTS LAW
### (Plaintiff Curley)

170.     Plaintiff Curley realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

171.     Plaintiff engaged in protected activity and suffered retaliation by Defendant in violation of NYSHRL, N.Y. Exec. Law § 296(7).

172.     Plaintiff suffered harm as a result of Defendant's unlawful retaliation.

## COUNT XIII

### RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW
### (New York Class and Plaintiff Curley & Aweh)

173.     Plaintiffs Curley and Aweh, individually and on behalf of all others similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

174.     Google maintains a substantial corporate presence in New York. Google employs approximately 12,000 people, including Plaintiff Curley.

175.     The NYCHRL, NYC Admin Code § 8-101, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such person," or to

"discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

176.     By its conduct as alleged herein, Defendant unlawfully discriminated against Curley and Aweh and those similarly situated in violation of NYCHRL, under both disparate treatment and disparate impact theories of liability.

177.     Google maintained racially discriminatory employment practices and policies, including but not limited to hiring, pay, job assignment, promotion, and other practices that had a disparate impact on Black employees who worked for Google in New York.

178.     Plaintiffs Curley and Aweh and all those similarly situated have suffered damages as a result of Google's violation of the NYCHRL.

## COUNT XIV

### SEX AND SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW
### (Plaintiff Curley)

179.     Plaintiff Curley realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

180.     The NYCHRL, establishes that it is unlawful, because of an individual's sex or sexual orientation, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

181.     Google violated the NYCHRL by discharging Plaintiff, discriminating against her in compensation and in terms, conditions, or privileges of employment, including by creating a hostile work environment, because of her sex and sexual orientation.

182.     Google maintained racially discriminatory employment practices and policies, including but not limited to pay, job assignment, promotion, and other practices that had a disparate impact on female and queer employees who worked for Google in New York.

183.     Plaintiff has suffered damages as a result of Google's violation of the NYCHRL.

## COUNT XV

### RETALIATION IN VIOLATION OF
### NEW YORK CITY HUMAN RIGHTS LAW
#### (Plaintiff Curley)

184.     Plaintiff Curley realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

185.     Google maintains a substantial corporate presence in New York. Google employs approximately 12,000 people, including Plaintiff Curley.

186.     Plaintiff engaged in protected activity and suffered retaliation by Defendant in violation of NYCHRL, N.Y.C. Admin. Code § 8-107(7).

187.     Plaintiff suffered harm as a result of Defendant's unlawful retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and all others similarly situated, respectfully request that this Court find against Defendant as follows:

a.     Certify this case as a class action, including a disparate treatment and disparate impact class of current and former Black or African American employees, and a class of Black or African American applicants who were denied employment;

b.     Certify the New York and California employee and hiring subclasses as described above (¶¶ 105–108);

c.    Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

d.    Declare that Defendant's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981, Title VII, FEHA, NYSHRL, and NYCHRL;

e.    Declare that Defendant engaged in unlawful race discrimination and retaliation against Plaintiffs, and order all appropriate relief;

f.    Declare that Defendant engaged in unlawful sex and disability discrimination and retaliation against Plaintiffs Mayon and Lewis, and order all appropriate relief;

g.    Declare that Defendant engaged in unlawful sex and sexual orientation discrimination and retaliation against Plaintiff Curley, and order all appropriate relief;

h.    Order Plaintiffs, and all others similarly situated, reinstated to their appropriate positions, promotions and seniority, and otherwise make Plaintiffs and all others similarly situated whole;

i.    Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Defendant's unlawful conduct;

j.    Award Plaintiffs and all others similarly situated compensatory and punitive damages;

k.    Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

SECOND AMENDED
COMPLAINT
- 47 -

l.      Award Plaintiffs and all others similarly situated such other make-whole equitable,

injunctive and legal relief as this Court deems just and proper to end the

discrimination and fairly compensate Plaintiffs and others similarly situated; and

m.      Award Plaintiffs and all others similarly situated such other relief as this Court

deems just and proper.

## **<u>DEMAND FOR A JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted on behalf of Plaintiff and those
similarly situated,

By:____*/s/ Suzanne E. Bish*_____

Linda D. Friedman (pro hac vice)
Suzanne E. Bish (pro hac vice)
George S. Robot (pro hac vice)
Mark S. Current (pro hac vice)
STOWELL & FRIEDMAN LTD.
303 W. Madison, Ste. 2600
Chicago, Illinois 60606
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com
mcurrent@sfltd.com

Ben Crump (pro hac vice)
Nabeha Shaer (pro hac vice)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
Telephone: (800) 713-1222
court@bencrump.com

Sam Sani
SANI LAW FIRM
15720 Ventura Blvd., Suite 405

Encino, CA 94612
Tel: (310) 935-0405
ssani@sanilawfirm.com

*Attorneys for Plaintiffs and the Putative Class*